# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# LAFAYETTE DIVISION

TROY ALLEN POWNELL, Special Administrator of the Unsupervised ESTATE OF TROY DEAN POWNELL, Deceased,

                Plaintiff,

      v.

ROBERT GOLDSMITH, in his official capacity as Sheriff of Tippecanoe County; THOMAS LEHMAN, in his official capacity as Jail Commander of the Tippecanoe County Jail; CARRIE MORGAN, in her individual capacity as Assistant Jail Commander of the Tippecanoe County Jail; PAUL WYANT, in his individual capacity as a jail officer of the Tippecanoe County Jail; BAILEY CLARK, in his individual capacity as a jail officer of the Tippecanoe County Jail; MAKENZIE CHEEVER, in her individual capacity as a jail officer of the Tippecanoe County Jail; COLE ZIMMER, in his individual capacity as a jail officer of the Tippecanoe County Jail; QUALITY CORRECTIONAL CARE, LLC; MONICA FLORES, L.P.N., in her individual capacity; and BRIANA FRAZIER, L.P.N., in her individual capacity,

                Defendants.

CAUSE NO.: 4:25-cv-0043

## COMPLAINT FOR DAMGES AND JURY DEMAND

Comes now Plaintiff, TROY ALLEN POWNELL, Special Administrator of the ESTATE OF TROY DEAN POWNELL, deceased, by counsel, Stephen M. Wagner of WAGNER REESE, LLP, and Susannah M. Hall-Justice of HALL-JUSTICE LAW FIRM, LLC, and for his cause of action against the Defendants, ROBERT GOLDSMITH, in his official capacity as Sheriff of Tippecanoe County (hereinafter "Goldsmith"); THOMAS LEHMAN, in his official capacity as Jail Commander of the Tippecanoe County Jail (hereinafter "Lehman"); CARRIE MORGAN, in

her individual capacity as Assistant Jail Commander of the Tippecanoe County Jail (hereinafter "Morgan"); PAUL WYANT, in his individual capacity as a jail officer of the Tippecanoe County Jail (hereinafter "Wyant"); BAILEY CLARK, in his individual capacity as a jail officer of the Tippecanoe County Jail (hereinafter "Clark"); MAKENZIE CHEEVER, in her individual capacity as a jail officer of the Tippecanoe County Jail (hereinafter "Cheever"); COLE ZIMMER, in his individual capacity as a jail officer of the Tippecanoe County Jail (hereinafter "Zimmer"); QUALITY CORRECTIONAL CARE, LLC (hereinafter "QCC"); Nurse MONICA FLORES (hereinafter "Flores" or "Nurse Flores"); and Nurse BRIANA FRAZIER (hereinafter "Frazier" or "Nurse Frazier") alleges and states as follows:

## JURISDICTION AND VENUE

1.      This is a civil rights wrongful death action brought for violations of the Eighth and Fourteenth Amendments of the Constitution of the United States of America made actionable pursuant to 42 U.S.C. § 1983.

2.      Jurisdiction is founded upon 28 U.S.C. § 1331 and § 1343 as well as 42 U.S.C. § 1983 and § 1988. Plaintiff further invokes the supplemental jurisdiction of this Court to hear and decide Plaintiff's claims arising under state law pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## PARTIES

4.      On September 17, 2024, by Order of the Tippecanoe County Circuit Court under Cause Number 79C01-2406-EU-000166, the Plaintiff, Troy Allen Pownell, was appointed Special Administrator of the Unsupervised Estate of Troy Dean Pownell, deceased, and in such capacity brings this cause of action against the Defendants.

5.      At all relevant times herein, the decedent, Troy Dean Pownell (hereinafter "Troy"), was unmarried and a citizen of the United States of America, State of Indiana, City of Delphi, County of Carroll. At the time of his death, Pownell was survived by his then minor child, Troy Allen Pownell.

6.      Defendant, Goldsmith, is the Sheriff of Tippecanoe County, Indiana, and at all relevant times hereto was acting under the color of state law. Defendant Goldsmith is sued in his official capacity only.

7.      At all relevant times herein, Defendant, Goldsmith, was responsible for enforcing the rules and regulations of the Tippecanoe County Sheriff's Department and Tippecanoe County Jail (hereinafter "Jail") and for ensuring that the Tippecanoe County Jail Officers obeyed the laws of the State of Indiana and the United States of America.

8.      At all relevant times herein, Defendant, Lehman, was the Jail Commander of the Jail and was acting under the color of state law. As such, he was the commanding officer of the Jail and in charge of its daily operations and the training, supervision, and conduct of Defendants Morgan, Wyant, Clark, Cheever, and Zimmer (collectively "Defendant Jail Officers"), as more fully set out *infra*. He is sued in his official capacity only.

9.      At all relevant times herein, Defendant, Lehman, was responsible for enforcing the rules and regulations of the Jail and for ensuring that the Defendant Jail Officers obeyed the laws of the State of Indiana and the United States of America.

10.     At all relevant times, Defendants, Goldsmith and Lehman, were in charge of, among other duties, overseeing the operation of the Jail, including adequately staffing the jail with properly trained jail officers so as to monitor the safety and well-being of the individuals housed at the jail.

11.     At all relevant times herein, the Defendant Jail Officers were employed by the Tippecanoe County Sheriff's Department and were assigned to work at the Jail. Said Defendants were acting under the color of state law and within the scope of their authority and employment, and as agents for the Tippecanoe County Sheriff's Department. They are sued in their individual capacities only.

12.     At all relevant times, Defendant, QCC, was a domestic limited liability company providing medical and mental health services to inmates and/or detainees at various correctional facilities in Indiana and in other states.

13.     At all relevant times, Defendant, QCC, was not a "qualified provider" as defined in I.C. 34-18-2-24.5.

14.     At all relevant times, Defendant, QCC, was contracted to provide medical and mental health treatment to detainees and inmates at the Jail.

15.     At all relevant times, Defendants, Flores and Frazier (hereinafter "Defendant Nurses"), were both registered as Licensed Practical Nurses ("LPNs") providing medical services to patients in Indiana and were not "qualified provider(s)" as defined in I.C. 34-18-2-24.5.

16.     At all relevant times, Defendant Nurses were acting within the course and scope of their employment and/or agency with the Defendant, QCC.

**BACKGROUND**

17.     On April 2, 2024, at approximately 11:00 PM, Troy was arrested on a warrant for failing to appear at a court hearing.

18.     Troy was then transported to the Jail located at 2640 Duncan Road in Lafayette, Indiana.

19.     On April 2, 2024, at approximately 11:50 PM, jail officer Kyle Kenny (hereinafter "Kenny") booked Troy into the Jail. At that time, Kenny interviewed Troy and completed a "Standard Medical Questions" form which indicated that (1) Troy had no obvious pain or symptoms suggesting the need for emergency medical care, (2) Troy did not appear to be under the influence of alcohol or drugs, (3) Troy had no symptoms of alcohol or drug withdrawal, and (4) Troy had no medical conditions other than a diagnosis of Hepatitis C six months earlier.

20.     On April 3, 2024, at approximately 4:40 AM, Nurse Tamara Stevenson conducted an "Initial Medical/Mental Health Assessment" of Troy and found no medical concerns. Troy was advised to "call out" for medical assistance if he began to experience any medical concerns and/or detox symptoms.

21.     Later in the day on April 3, 2024, Troy began to feel ill. He spent the entire day on his mattress on the floor of his cell, only getting up to eat, use the restroom, and adjust his mattress.

22.     Troy similarly spent April 4, 2024, and April 5, 2024, in physical discomfort. In-cell video footage shows Troy laying down most of the day, placing various towels over his head and body, and shifting around trying to get comfortable.

23.     On April 6, 2024, at approximately 2:57 PM, Troy was moved to a cell in the C Block of the Jail.

24.     Troy's physical symptoms began to worsen on April 6, 2024, after being relocated to the C Block. Troy had to remove himself from a game of cards after complaining about his stomach hurting and dry heaving.

25.     Troy spent all day on April 7, 2024, in his cell, complaining about severe abdominal pain.

26.    Early on the morning of April 8, 2024, Troy's cell mate, Greg Lawson (hereinafter "Lawson"), pressed the button in their cell at least four times trying to get medical assistance for Troy. It took about 45 minutes for Jail staff to arrive.

27.    Lawson informed staff of the Jail over the intercom call that Troy was hurting bad, in pain, and that his dry heaving had turned to "puking."

28.    Troy continuously told Lawson that, "this isn't good." Troy was unable to get up and move on his own, so Lawson had to assist Troy in getting water and finding towels.

29.    On April 8, 2024, at approximately 5:47 AM, Troy was checked on by Kenny, the first time a correctional officer responded to Troy's cell in response to his complaints of severe abdominal pain.  At that time Kenny spoke to Troy inside and outside his cell, and ultimately contacted a member of the medical contractor, QCC, and was advised that someone would come see Troy within the hour. When it came time for Kenny to go home, he informed his relieving officer of the situation and instructed them to contact medical again if they didn't arrive within the hour.

30.    Despite Kenny's instructions to his relieving officer and QCC's promise to have Troy seen within the hour—and only after Lawson's numerous calls to the Jail staff and upon Kenny's earlier request—Nurse Flores (accompanied by a jail officer) did not arrive to the C Block until approximately 8:35 AM.

31.    Nurse Flores can be seen entering Troy's cell at approximately 8:37 AM on April 8, 2024, the first time that QCC checked on Troy for his severe abdominal pain (and roughly 2 hours and 40 minutes after Kenny's request for medical staff to evaluate Troy).

32.    Nurse Flores found Troy in his cell sitting on a mat on the floor, pale and diaphoretic (excessively sweating). Her notes indicate that Troy was not feeling well due to left

side abdominal pain. Her notes further indicate that Troy had an abnormal heart rate and his pupils were slow to respond.

33.    Lawson communicated to Nurse Flores for the first time that Troy informed him that Troy used heroin prior to booking.

34.    Nurse Flores then disregarded Troy's serious abdominal pain, instead insisting it was simply a symptom of drug withdrawal. Nurse Flores stated that Troy's stomach only hurt because he was dry heaving.

35.    On April 8, 2024, at approximately 8:41 AM, Troy was removed from his C Block cell and placed back in a receiving cell for medical evaluation. Nurse Flores accompanied Troy out of his cell. Troy can be seen struggling to get down the stairs, having to use the railing to assist himself with every step.



36.    Nurse Flores conducted a Sick Call medical evaluation of Troy at approximately 8:54 AM on April 8, 2024. An order for X-rays of Troy's abdomen was placed as part of the medical evaluation.

37.     During this medical evaluation with Nurse Flores, Troy admitted to his heroin use prior to booking. Consequently, Nurse Flores again concluded that Troy only needed electrolytes and to undergo "detox checks" for withdrawal symptoms.

38.     According to the World Health Organization, the onset of opioid withdrawal symptoms for short acting opioids (such as heroin) begins 8-24 hours after last use.[1]

39.     According to the Lake County Indiana Health Department, peak symptoms for opioid withdrawal occur 24-72 hours (1-3 days) after last use.[2]

40.     Troy did not begin to experience painful abdominal symptoms until the afternoon on April 6, 2024, which was almost 4 days after he was booked into the Jail.

41.     Troy's symptoms did not peak until April 8, 2024, which was almost 6 days after he was booked (his last use).

42.     By April 8, 2024, Troy was well past the time when he should have been experiencing severe drug withdrawal symptoms.

43.     It was obvious on April 8, 2024, that Troy was suffering from a serious medical condition other than drug withdrawal.

44.     Nurse Flores mistakenly diagnosed Troy's symptoms as symptoms of drug withdrawal instead of a more serious differential diagnosis.

45.     At approximately 9:51 AM on April 8, 2024, Troy began to press the button in his cell to receive medical attention. He had to do this three more times before a nurse arrived. The "day nurse" (accompanied by a correctional officer) can be seen placing what appears to be a blood pressure cuff on Troy in the doorway of his cell before leaving him.

---

[1] *See* https://www.ncbi.nlm.nih.gov/books/NBK310652/.
[2] *See* https://lakecountyin.gov/departments/health/Nursing-Clinic/Prevention/Opioids/opioid-withdrawal-understanding-the-challenges-and-symptoms-of-recovery.

46.     Due to Troy's deteriorating condition, Jacob Loveall (hereinafter "Loveall"), Troy's cell mate at the time, also began to press the intercom button and bang on the cell door beginning at approximately 10:41 AM on April 8, 2024. After several attempts by Loveall to call for assistance, Nurse Flores and the "day nurse" (accompanied by a correctional officer) responded to Troy's cell at approximately 10:46 AM.

47.     Nurse Flores's notes from 11:08 AM on April 8, 2024, indicate that Troy told the Jail's medical staff and the Defendant Jail Officers that he was not feeling well by constantly yelling out from his cell and begging to go to the hospital.

48.     It was obvious at that time that Troy was suffering from a medical emergency and needed to go to the hospital.

49.     Nurse Flores wrote off Troy's symptoms as Troy "faking" something serious. Nurse Flores again only gave Troy more electrolytes despite Troy insisting to her that he was not withdrawing from heroin. Nurse Flores and the "day nurse" left Troy in his receiving cell looking grey and weak. Troy had to either lean on the wall, the bunk beds, or the small table in the cell to keep himself off the floor.



50.     Troy spent the late morning and early afternoon on April 8, 2024, constantly spitting mucus and vomiting into small cups in his cell. The vomit was occasionally red in color (presumably blood). The only assistance Troy received was at 11:44 AM, when a correctional officer brought Loveall cleaning supplies to clean up Troy's mess, and at 11:46 AM, when a nurse brought Troy two plastic cups full of liquid (presumably containing more electrolytes).

51.     It was obvious at that time that Troy was suffering from a medical emergency and needed to go to the hospital.

52.     During this time, Loveall (and an unidentified third cell mate of Troy's that was temporarily in his receiving cell with him) pressed the call button in his cell at least four times due to Troy's deteriorating condition.

53.     Nurse Flores's next medical evaluation of Troy came at approximately 2:26 PM on April 8, 2024, after Troy began to complain of mucus coming from his mouth and penis.

54.     Loveall stated that Troy "couldn't move" by this time and "looked like a frail old man." Nurse Flores noted that Troy's hands were cold and clammy.

55.     Troy indicated to Nurse Flores that the entire left side of his body was hurting with severe abdominal pain, that he had not eaten that day, and that he was continuing to throw up mucus.[3]

56.     It was obvious at that time that Troy was suffering from a medical emergency and needed to go to the hospital.

---

[3] Nurse Flores's notes read, "when asking [patient] to point to abdominal pain he points to center of [abdomen] from bottom to top."

57.     According to MedLine Plus, signs and symptoms of a peptic or perforated ulcer include (among other things): pain in the upper abdomen, restlessness due to discomfort, feelings of fullness/loss of appetite/troubles eating, and vomiting (possibly bloody).[4]

58.     Nurse Flores again stated that Troy only needed electrolytes because he was simply withdrawing from heroin. She instructed him to rinse the cup that he had been puking in; however, when Troy refused to do so, Nurse Flores withheld the electrolytes.

59.     Loveall himself thought that it was "weird" for Troy to only be diagnosed as withdrawing from drugs when he considered the fact that Troy had been in jail for about 6 days at this point.

60.     Nurse Flores believed Troy was making up his symptoms. She told Troy "you're not getting a free ride to the hospital today" and something to the like of "since you're just going to continue to f*ck around, we [the nurses] are just going to leave [you here]." Troy was again left in his receiving cell following this medical evaluation. He appeared visibly ill and had to lean on the top bunk to support himself in standing.



---

[4] *See* https://medlineplus.gov/ency/article/000206.htm.

61.     Loveall continued to press the call button inside the receiving cell without any response from the Defendant Jail Officers and Nurse Flores. Due to the lack of any response, Loveall also banged on the door to try to get assistance for Troy.

62.     At approximately 3:46 PM on April 8, 2024, following through on her promise to leave Troy suffering, Nurse Flores (accompanied by a correctional officer) can be seen ignoring Loveall's efforts to get Troy assistance. Instead, Nurse Loveall walked away from Troy's receiving cell without even checking on him.

63.     Troy informed Loveall that he thought he was dying. In the background of Loveall's intercom calls to Jail staff, Troy can be heard pleading in a raspy voice that he needs help.

64.     The Defendant Jail Officers were deliberately indifferent to Troy's serious medical condition. At one point, Wyant told Troy to just "stop being a p*ssy."

65.     Loveall was repeatedly told by the Defendant Jail Officers not to touch the call button and that the button was for emergencies only. During one intercom call, the Defendant Jail Officers can be heard shouting at Loveall to stop pressing the call button and banging on the cell door.

66.     At approximately 4:35 PM on April 8, 2024, Troy left his receiving cell. He returned at approximately 4:51 PM in a wheelchair accompanied by Clark.

67.     Clark refused to assist Troy out of his wheelchair upon returning Troy to his receiving cell. Instead, Loveall had to assist Troy, who was visibly short of breath.



68.     Troy's X-ray findings were returned to the Jail at approximately 5:28 PM on April 8, 2024. The X-ray conclusion was a nonobstructive abdominal bowel gas pattern despite Troy still displaying "excruciating symptoms" as charted by Nurse Frazier.

69.     It was obvious at that time that Troy was suffering from a medical emergency and needed to go to the hospital.

70.     Despite the fact that Troy was obviously in medical distress and needed emergency medical care, Dr. Eric Tchaptchet advised Nurse Frazier to "send [Troy] out" only if he developed any new or worsening symptoms.

71.     By 6:00 PM on April 8, 2024, Troy looked extremely ill. He was curled up in a ball and continued to vomit in his small drink cup.

72.    Loveall continued to routinely press the call button and bang on the cell door in an effort to get Troy help.

73.    At approximately 7:31 PM on April 8, 2024, Troy began to convulse while leaning against the top bunk in his cell. Loveall lowered him to the ground.

 

74.    Loveall assisted Troy to the bottom bunk, where his convulsions developed into a seizure.

75.    Four minutes later, at approximately 7:35 PM, Nurse Frazier, "Nurse Sam," Morgan, and Cheever finally responded to Loveall's pleading for medical assistance.

14

76.    Nurse Frazier, "Nurse Sam," Morgan, and Cheever picked up Troy, removed him from his receiving cell, and set him down in the open hallway.



77.    Nurse Frazier, "Nurse Sam," Morgan, and Cheever placed a blood pressure cuff on Troy. Glucose and glucagon were applied. Troy was not verbally responsive at that time.

78.    Troy was cold to the touch and had no pulse by this time.

79.    At approximately 7:42 PM, medics from the Lafayette Fire Department arrived on scene. Troy was entirely unresponsive by this time.

80.    At approximately 7:59 PM, EMS personnel arrived and transported Troy to Franciscan Health Lafayette East.

81.    It took 1 hour and 33 minutes from the time that Loveall began to press the call button again around 6:00 PM until anyone finally arrived to assist Troy, who was dying.

82.    During this time, Morgan, Cheever, and Zimmer were all working in the receiving area of the Jail. Despite Troy's and Loveall's consistent cries for help, none of them came to Troy's aid until he began to seize.[5]

83.    By the time Troy arrived at the hospital, he was unresponsive and his extremities were cold. He was diaphoretic and had no pulse. The ER physician noted that Troy had suffered cardiac arrest, acute respiratory failure, and required endotracheal intubation.

84.    Troy's official time of death was 7:22 PM on April 9, 2024.

85.    The coroner noted that Troy's cause of death was sepsis due to a perforated duodenal ulcer, with cirrhosis of the liver contributing.

86.    Troy died a slow and painful death.

87.    During his detention at the Jail and prior to the beginning of his seizures on April 8, 2024, Troy, or others acting on his behalf (including Lawson and Loveall), attempted to contact the Defendant Jail Officers at least 21 times for emergency medical assistance, either through the intercom button or by making noise through the cell door.

## CLAIMS FOR RELIEF

### Count I – Section 1983 Claim for Deliberate Indifference
### Against Defendants Morgan, Wyant, Clark, Cheever, and Zimmer

88.    Plaintiff hereby incorporates by reference paragraphs 1 through 87 of his *Complaint for Damages and Jury Demand* as if fully set forth herein.

---

[5] Morgan's Police Incident Report notes that not only was she working in receiving, but she was working on "answering phones and intercoms." Therefore, she heard Loveall's numerous attempts to call for medical assistance using the button in their cell. Furthermore, all three officers heard Loveall banging on the cell door asking for medical assistance.

89.    During his detention at the Jail, Troy was obviously suffering from a serious medical emergency for a prolonged period of time.

90.    During his detention at the Jail, Troy displayed obvious signs and symptoms of a perforated ulcer, including (but not limited to) severe abdominal pain, restlessness, discomfort, nausea, troubles eating, and vomiting (including vomiting blood), which required emergency medical attention.

91.    During his detention at the Jail, the Defendant Jail Officers were deliberately indifferent to Troy's serious medical condition and ignored his obvious need for emergency medical care to treat his worsening symptoms.

92.    The failure of the Defendant Jail Officers to monitor and evaluate Troy for new or worsening symptoms and the failure to provide Troy with emergency medical treatment in a timely manner demonstrates a total lack of regard for his right to be free from unnecessary and unlawful bodily harm.

93.    The acts and omissions of the Defendant Jail Officers as described herein were done willfully, wantonly, maliciously, and with such reckless disregard for the consequences as to reveal a conscious and deliberate indifference to Troy's serious medical condition, which resulted in his untimely and tragic death.

94.    The Defendant Jail Officers herein are responsible for Troy's death as a result of their intentional, willful, wanton, reckless, and/or negligent acts and omissions, including (but not limited to) the failure to monitor, protect, and provide for the safety of Troy while he was detained; the failure to properly diagnose Troy's symptoms; the failure to monitor Troy for new or worsening symptoms; and the failure to timely contact emergency medical personnel to transport Troy to the hospital.

95.    As a direct and proximate result of the aforementioned conduct of the Defendant Jail Officers, Troy was deprived of the rights, privileges, and immunities secured to him under the Constitution and laws of the United States of America, including his rights under the Eighth Amendment of the United States Constitution.

96.    As a direct and proximate result of the wrongful acts and omissions of the Defendant Jail Officers as described above, Troy died, and therefore, the Plaintiff seeks to recover damages for the wrongful death of Troy, including his funeral and burial expenses, expenses incurred in the administration of his estate, reasonable attorney fees and costs pursuing this action, and any and all other damages allowed by state and federal law.

<u>**Count II – Section 1983 Claim for Deliberate Indifference Against Defendants Flores and Frazier**</u>

97.    Plaintiff hereby incorporates by reference paragraphs 1 through 96 of his *Complaint for Damages and Jury Demand* as if fully set forth herein.

98.    During Troy's detention at the Jail, the Defendant Nurses were deliberately indifferent to Troy's serious medical condition and ignored his obvious need for medical care.

99.    During Troy's detention at the Jail, the Defendant Nurses were deliberately indifferent to Troy's serious medical condition and ignored the obvious need to treat Troy's severe perforated ulcer symptoms.

100.    During Troy's detention at the Jail, the Defendant Nurses were deliberately indifferent to Troy's serious medical condition and need to see medical personnel.

101.    During Troy's detention at the Jail, the Defendant Nurses were deliberately indifferent to Troy's serious medical condition and the need to surgically repair the damage in Troy's ulcer in order to treat his serious medical condition.

102.    The failure of the Defendant Nurses to properly diagnose Troy, the failure to monitor Troy for new or worsening symptoms, and the failure to provide Troy with the necessary medical treatment in a timely manner all demonstrate a total lack of regard for his right to be free from unnecessary and unlawful bodily harm.

103.    The acts and omissions of the Defendant Nurses as described herein were done willfully, wantonly, maliciously, and with such a reckless disregard of the consequences as to reveal a conscious and deliberate indifference to Troy's serious medical condition which resulted in his untimely and tragic death.

104.    The Defendant Nurses are responsible for Troy's death as a result of their intentional, willful, wanton, reckless, and/or negligent acts or omissions, including (but not limited to) the failure to properly diagnose the symptoms that Troy was experiencing; the failure to provide adequate medical care; the failure to monitor, protect, and provide for the safety of Troy while he was detained; the failure to monitor Troy for new or worsening symptoms; the failure to examine Troy when requested by the medical assistance button; the failure to provide Troy with life saving treatment and pain reducing medications; and the failure to timely contact emergency medical personnel to transport Troy to the hospital.

105.    As a direct and proximate result of the aforementioned conduct of the Defendant Nurses, Troy was deprived of the rights, privileges, and immunities secured to him under the Constitution and laws of the United States of America, including his rights under the Eighth Amendment to the United States Constitution.

106.    As a direct and proximate result of the wrongful acts and omissions of the Defendant Nurses as described above, Troy died, and therefore, the Plaintiff seeks to recover damages for the wrongful death of Troy, including his funeral and burial expenses, expenses

incurred in the administration of his estate, reasonable attorney fees and costs pursuing this action, and any and all other damages allowed by state and federal law.

## Count III – Section 1983 Claim for Deliberate Indifference
### Against Defendants Goldsmith and Lehman, in their official capacities

107.    Plaintiff hereby incorporates by reference paragraphs 1 through 106 of his *Complaint for Damages and Jury Demand* as if fully set forth herein.

108.    Defendants, Goldsmith and Lehman, in their official capacities, are liable under 42 U.S.C. § 1983 for Troy's death which was proximately caused by the persistent and widespread customs, policies and/or practices of the Jail, which resulted in the unconstitutional conduct of the Defendant Jail Officers.

109.    At all times relevant to this lawsuit, there was a widespread practice at the Jail of failing to properly monitor inmates and/or detainees who were at risk of, or actually suffering from, a serious medical emergency. Specifically, all of the Jail officers, including the Defendant Jail Officers, would perform inadequate checks on inmates and/or detainees, or completely ignore inmates and/or detainees, who were known to be experiencing symptoms of a serious medical condition.

110.    The unconstitutional and widespread practice is evidenced by the fact that, during their respective interviews with Rector, both Lawson and Loveall stated that it would typically take between 30 minutes and 1 hour for staff of the Jail to respond to the emergency medical button intercom that was placed inside inmates' and/or detainees' cells. That is, if staff of the Jail responded at all.

111.    The unconstitutional and widespread practice is further evidenced by the fact that staff of the Jail would routinely ignore the obvious signs of Troy's serious medical distress on the

video surveillance feed and intercom audio from within his cell and would refuse to offer him assistance.

112.    The unconstitutional and widespread practice is further evidenced by the fact that when staff of the Jail did respond to Troy's several calls for help, their responses were entirely inadequate and often hostile. Staff of the Jail would become agitated with inmates and/or detainees when they were forced to do their job and check on the inmates and/or detainees.

113.    The unconstitutional and widespread practice is further evidence by the fact that several officers of the Jail, including the Defendant Jail Officers, openly slandered Troy, labeled him a "faker," and called him names for requesting medical attention to assist with his serious medical condition.

114.    The unconstitutional and widespread practice is further evidenced by the fact that another inmate died at the Jail the same week as Troy due to the Jail's failure to properly treat her ongoing medical condition.[6]

115.    Defendants, Goldsmith and Lehman, also had a duty to train and supervise the Defendant Jail Officers regarding how to monitor and provide a safe environment for inmates and/or detainees experiencing serious medical conditions, such as Troy.

116.    Defendants, Goldsmith and Lehman, allowed the Defendant Jail Officers to be employed as correctional officers without adequate supervision and training on how to monitor and provide a safe environment for inmates and/or detainees suffering from serious medical conditions, such as Troy.

---

[6] *See* https://www.jconline.com/story/news/local/2024/04/11/two-tippecanoe-county-jail-inmates-die-in-one-week/73290393007/.

117.   The widespread practice described herein created a likelihood that substantial violations of the constitutional rights of inmates and/or detainees at the Jail, and in particular Troy, would occur.

118.   The inadequate training of the Jail officers by Defendants, Goldsmith and Lehman, reflects a deliberate indifference to the constitutional rights of inmates and/or detainees at the Jail, including Troy.

119.   Defendants, Goldsmith and Lehman, were on notice of a pattern of constitutional violations resulting from the inadequate training of the Jail officers, but deliberately and consciously allowed the violations to continue.

120.   Defendants, Goldsmith and Lehman, were deliberately indifferent to the obvious need for supervising and training the Defendant Jail Officers regarding how to monitor inmates and/or detainees suffering from serious medical conditions, such as Troy.

121.   As a direct and proximate result of the aforementioned conduct of Defendants, Goldsmith and Lehman, and the widespread practices described herein, Troy was deprived of the rights, privileges, and immunities secured to him under the Constitution and laws of the United States of America, including his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

122.   As a direct and proximate result of the aforementioned conduct of Defendants, Goldsmith and Lehman, and the widespread practice described herein, Troy died, and therefore, the Plaintiff seeks to recover damages for the wrongful death of Troy, including his funeral and burial expenses, expenses incurred in the administration of his estate, reasonable attorney fees and costs pursuing this action, and any and all other damages allowed by state and federal law.

## Count IV – Negligence Claim
## Against Defendant Goldsmith, in his official capacity

123.    Plaintiff hereby incorporates by reference paragraphs 1 through 122 of his *Complaint for Damages and Jury Demand* as if fully set forth herein.

124.    In accordance with Indiana statute, Defendant, Goldsmith, was timely served with a Notice of Tort Claim on September 9, 2024, by certified mail, return receipt requested.

125.    Pursuant to Indiana statute, the Plaintiff's tort claim has been constructively denied as Defendant has had more than ninety (90) days to investigate the claim but has failed to respond in any manner.

126.    At all relevant times herein, the Defendant Jail Officers were employees of Defendant, Goldsmith, in his official capacity, and were acting in the course and scope of their employment with the Tippecanoe County Sheriff's Department. As such, Defendant, Goldsmith, in his official capacity, is liable for the negligent acts of his employees, the Defendant Jail Officers, under the doctrine of *respondeat superior*.

127.    The Defendants named in Count I and Count III are responsible for Troy's death as the result of their negligent acts and omissions, including (but not limited to) the failure to provide medical care and/or treatment to Troy; the failure to monitor, protect, and provide a safe and healthy environment for Troy while detained, including adequately monitoring Troy for new or worsening symptoms of a serious medical condition; the failure to provide Troy with emergency medical treatment in a timely manner; and the failure to properly train and supervise their employees, including the Defendant Jail Officers.

128.    Defendant, Goldsmith, also negligently hired, supervised, and retained the Defendant Jail Officers when he knew, or should have known, that the Defendant Jail Officers were not properly trained and were otherwise unfit for service.

23

129.    As a direct and proximate result of the wrongful acts and omissions of the Defendant, Goldsmith, as described above, Troy died, and therefore, the Plaintiff seeks to recover damages for the wrongful death of Troy, including his funeral and burial expenses, expenses incurred in the administration of his estate, reasonable attorney fees and costs pursuing this action, and any and all other damages allowed by state and federal law.

### Count V – Negligence Claim
### Against Defendant QCC

130.    Plaintiff hereby incorporates by reference paragraphs 1 through 129 of his *Complaint for Damages and Jury Demand* as if fully set forth herein.

131.    Although not required by law, Defendant, QCC, was timely served with a Notice of Tort Claim on September 9, 2024, by certified mail, return receipt requested.

132.    Defendant, QCC, failed to respond in any manner.

133.    At all relevant times herein, the Defendant Nurses were employees of Defendant, QCC, acting in the course and scope of their employment. As such, Defendant, QCC, is liable for the negligent acts of its employees, the Defendant Nurses, under the doctrine of *respondeat superior*.

134.    The Defendants named in Count II are responsible for Troy's death as the result of their negligent acts and omissions, including (but not limited to) the failure to provide medical care and/or treatment to Troy; the failure to monitor, protect, and provide a safe and healthy environment for Troy while detained, including the failure to adequately monitor Troy for new or worsening symptoms of a serious medical condition; the failure to provide Troy with emergency medical treatment in a timely manner; and the failure to properly train and supervise their employees, including the Defendant Nurses.

24

135.    Defendant, QCC, also negligently hired, supervised, and retained the Defendant Nurses when it knew, or should have known, that the Defendant Nurses were not properly trained and were otherwise unfit for service.

136.    As a direct and proximate result of the wrongful acts and omissions of the Defendant, QCC, as described above, Troy died, and therefore, the Plaintiff seeks to recover damages for the wrongful death of Troy, including his funeral and burial expenses, expenses incurred in the administration of his estate, reasonable attorney fees and costs pursuing this action, and any and all other damages allowed by state and federal law.

**WHEREFORE,** Plaintiff, Troy Allen Pownell, as Special Administrator of the Unsupervised Estate of Troy Dean Pownell, deceased, requests the following relief:

a.    An award of compensatory damages based on Plaintiff's 42 U.S.C. § 1983 claims for the violation of Troy's constitutional rights;

b.    An award of punitive damages against the Defendant Jail Officers based on Plaintiff's 42 U.S.C. § 1983 claim to punish Defendants for their callous or reckless indifference to Plaintiff's constitutional rights;

c.    An award of punitive damages against the Defendant Nurses based on Plaintiff's 42 U.S.C. § 1983 claim to punish Defendants for their callous or reckless indifference to Plaintiff's constitutional rights;

d.    An award of compensatory damages for the wrongful death of Troy, including (but not limited to) all damages allowed by federal law and by the Indiana Wrongful Death Act, I.C. 34-23-1-2;

e.    An award of attorney fees and costs pursuant to 42 U.S.C. § 1988;

f.    Trial by jury; and

g.    All other relief just and proper in the premises.


Respectfully submitted,

**WAGNER REESE, LLP**


*/s/ Stephen M. Wagner*
Stephen M. Wagner, #18248-49
*Attorney for Plaintiff*


**HALL-JUSTICE LAW FIRM, LLC**


*/s/ Susannah M. Hall-Justice*
Susannah M. Hall-Justice, #20153-79
*Attorney for Plaintiff*

26

## JURY DEMAND

Comes now the Plaintiff, by counsel, and hereby demands trial by jury against the Defendants on all issues set forth in this cause of action.

Respectfully submitted,

**WAGNER REESE, LLP**

*/s/ Stephen M. Wagner*
Stephen M. Wagner, #18248-49
*Attorney for Plaintiff*

**HALL-JUSTICE LAW FIRM, LLC**

*/s/ Susannah M. Hall-Justice*
Susannah M. Hall-Justice, #20153-79
*Attorney for Plaintiff*

WAGNER REESE, LLP
11939 North Meridian Street
Carmel, IN 46032
Tel:    (317) 569-0000
Fax:    (317) 569-8088
Email: swagner@wagnerreese.com

HALL-JUSTICE LAW FIRM, LLC
200 Ferry Street, Suite A
P.O. Box 1218
Lafayette, IN 47902
Tel:    (765) 742-2987
Fax:    (765) 420-0948
Email: susannah@halljustice.com